*In the*

*UNITED STATES COURT OF APPEALS*

*For the Eighth Circuit*
_____

*Nos. 02-4084, 02-4085, 03-1067*

*Criminal*

_____

*UNITED STATES OF AMERICA,*

*APPELLEE,*

*v.*

*KEITH BERNARD CRENSHAW,*
*KAMIL HAKEEM JOHNSON, and*
*TIMOTHY K. MCGRUDER*

*APPELLANTS.*
_____

*Appeal from the United States District Court for the*

*District of Minnesota*
_____

*BRIEF OF APPELLEE*
_____

*THOMAS B. HEFFELFINGER*
*United States Attorney*
*BY: JEFFREY S. PAULSEN*
*Assistant U.S. Attorney*
*Attorney ID No. 144332*
*District of Minnesota*
*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*
*(612) 664-5600*

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

The defendants were convicted of murder in aid of racketeering activity in violation of 18 U.S.C. § 1959. They were all members or associates of the Rolling 60's Crips gang, an interstate cocaine trafficking enterprise based in St. Paul, Minnesota. While trying to ambush members of the rival Bogus Boys gang at a St. Paul gas station as part of an ongoing gang war, they shot and killed an innocent four-year-old girl and wounded three other innocent bystanders.

The defendants allege that the statute under which they were convicted, 18 U.S.C. § 1959, is unconstitutional under the Commerce Clause, that the evidence was insufficient to support their convictions, and that the District Court abused its discretion in admitting certain evidence and not ordering disclosure of the identity of a confidential informant.

The government requests 30 minutes for oral argument.

i

# TABLE OF CONTENTS

PAGE

SUMMARY AND REQUEST FOR ORAL ARGUMENT . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . .  vii

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . .  1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . .  7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  9

    I.   18 U.S.C. § 1959, WHICH PROHIBITS MURDER IN AID OF
RACKETEERING ACTIVITY, IS A CONSTITUTIONAL EXERCISE OF
CONGRESS' POWER UNDER THE COMMERCE CLAUSE . . . .  9

    II.  THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE DEFENDANTS'
CONVICTIONS FOR MURDER IN AID OF RACKETEERING ACTIVITY
. . . . . . . . . . . . . . . . . . . . . . 14

        A.  THE ROLLING 60'S CRIPS GANG CONSTITUTED A RICO
ENTERPRISE . . . . . . . . . . . . . . . . . . 15

        B.  THE ACTIVITIES OF THE ENTERPRISE AFFECTED
INTERSTATE COMMERCE . . . . . . . . . . . . 18

        C.  THE DEFENDANTS ACTED WITH THE REQUIRED MOTIVE 21

        D.  EACH OF THE DEFENDANTS PARTICIPATED IN THE
MURDER . . . . . . . . . . . . . . . . . . . 25

        E.  MINNESOTA'S ACCOMPLICE CORROBORATION JURY
INSTRUCTION DOES NOT APPLY IN A FEDERAL TRIAL 33

    III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
ADMITTING EVIDENCE OF CRENSHAW'S PRIOR CONVICTIONS 35

    IV.  THE DISTRICT COURT PROPERLY REFUSED TO ORDER DISCLOSURE
OF THE IDENTITY OF A CONFIDENTIAL INFORMANT WHO WAS NOT

Appellate Case: 03-1067   Page: 3   Date Filed: 07/15/2003 Entry ID: 1665148

A WITNESS TO THE CRIME . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . 42

ADDENDUM OF APPELLEE . . . . . . . . . . . . . . . 43

iii

# TABLE OF AUTHORITIES

PAGE

**CASES:**

Carpenter v. Lock, 257 F.3d 775 (8th Cir. 2001),
    cert. denied, 534 U.S. 1091 (2002) . . . . . . . . . . 39

Firemen's Fund Ins. v. Thien, 8 F.3d 1307 (8th Cir. 1993) . 40

Roviaro v. United States, 353 U.S. 53 (1957) . . . . . . . 39

United States v. Brown, 330 F.3d 1073 (8th Cir. 2003) . 19, 33

United States v. Carrillo, 229 F.3d 177 (2d Cir. 2000) . . 33

United States v. Concepcion, 983 F.2d 369 (2d Cir. 1992) . 25

United States v. Darden, 70 F.3d 1507 (8th Cir. 1995) . 15, 16

United States v. Davidson, 122 F.3d 531 (8th Cir. 1997) 15, 16

United States v. Enriquez, 201 F.3d 1072 (8th Cir. 2000) . 30

United States v. Exson, 328 F.3d 456 (8th Cir. 2003) . . . 30

United States v. Fairchild, 122 F.3d 605 (8th Cir. 1997) . 22

United States v. Feliciano, 223 F.3d 102 (2d Cir. 2000)
    . . . . . . . . . . . . . . . . . . . . 12, 20, 21

United States v. Fiel, 35 F.3d 997 (4th Cir. 1994) . . 15, 22

United States v. Francis, 327 F.3d 729 (8th Cir. 2003) . . 14

United States v. Frazier, 280 F.3d 835 (8th Cir. 2002) . . 37

United States v. Frega, 179 F.3d 793 (9th Cir. 1999) . . . 11

United States v. Gray, 137 F.3d 765 (4th Cir. 1998) 12, 20, 21

United States v. Hamilton, 2003 WL 21403162 at *3
    (8th Cir. June 19, 2003) . . . . . . . . . . . . . . . 14

United States v. Howard, 235 F.3d 366 (8th Cir. 2000) . . . 35

iv

v

<u>United States v. Juvenile Male</u>, 118 F.3d 1344 (9th Cir. 1997)
. . . . . . . . . . . . . . . . . . . . . . . 11, 12, 20

<u>United States v. Kehoe</u>, 310 F.3d 579, 588 (8th Cir. 2002),
<u>cert. denied</u>, 123 S. Ct. 2112 (2003) . . . . . . . 11, 33

<u>United States v. Kragness</u>, 830 F.2d 842 (8th Cir. 1987) . . 16

<u>United States v. Lapsley</u>, 263 F.3d 839 (8th Cir. 2001) . . 41

<u>United States v. Letts</u>, 264 F.3d 787 (8th Cir. 2001),
<u>cert. denied</u>, 535 U.S. 908 (2002) . . . . . . . . 9, 19

<u>United States v. Lopez</u>, 514 U.S. 549 (1995) . 7, 10-12, 19, 20

<u>United States v. Maloney</u>, 71 F.3d 645 (7th Cir. 1995) . . . 11

<u>United States v. Mapp</u>, 170 F.3d 328 (2d Cir. 1999) 12, 20, 21

<u>United States v. Marino</u>, 277 F.3d 11 (1st Cir. 2002),
<u>cert. denied</u>, 536 U.S. 948 (2002) . . . . . . 11, 12, 20

<u>United States v. Miller</u>, 116 F.3d 641 (2d Cir. 1997) . . . 21

<u>United States v. Morrison</u>, 529 U.S. 598 (2000) . . . . 10, 11

<u>United States v. Muyet</u>, 994 F. Supp. 550 (S.D.N.Y. 1998) . 11

<u>United States v. Page</u>, 167 F.3d 325 (6th Cir. 1999) . . . . 12

<u>United States v. Riddle</u>, 249 F.3d 529 (6th Cir. 2001),
<u>cert. denied</u>, 534 U.S. 930 (2001) . . . . . . 11-13, 20

<u>United States v. Riley</u>, 985 F. Supp. 405 (S.D.N.Y. 1997) 12, 20

<u>United States v. Robertson</u>, 514 U.S. 669 (1995) (per curiam) 12

<u>United States v. Rolett</u>, 151 F.3d 787 (8th Cir. 1998) . . . 23

<u>United States v. Thomas</u>, 114 F.3d 228 (D.C. Cir. 1997) . . 21

<u>United States v. Tipton</u>, 90 F.3d 861 (4th Cir. 1996),
<u>cert. denied</u>, 117 S.Ct. 2414 (1997) . . . . . . . . . 22

<u>United States v. Tomberlin</u>, 130 F.3d 1318 (8th Cir. 1997) . 35

Appellate Case: 03-1067    Page: 7    Date Filed: 07/15/2003 Entry ID: 1665148

<u>United States v. Torres</u>, 129 F.3d 710 (2d Cir. 1997)11, 12, 20

<u>United States v. Vasquez</u>, 267 F.3d 79 (2d Cir. 2001),
    <u>cert. denied</u>, 534 U.S. 1148 (2002) . . . . . . . . . . 21

<u>United States v. Williams</u>, 308 F.3d 833 (8th Cir. 2002) . . 35

<u>United States v. Wright</u>, 145 F.3d 972 (8th Cir. 1998) . . . 39

Appellate Case: 03-1067    Page: 8    Date Filed: 07/15/2003 Entry ID: 1665148

PAGE

**STATUTES:**

Title 18, United States Code, Section 1959 7, 9, 11, 13, 20, 25

Title 18, United States Code, Section 1959(a) . . . . . 15, 23

Title 18, United States Code, Section 1959(a)(1) . . . . . 10

Title 18, United States Code, Section 1961 . . . . . . . . 11

Title 18, United States Code, Section 1961(1) . . . . . . . 14

Title 18, United States Code, Section 922(q) (1994) . . . . 10


**OTHER AUTHORITIES:**

Eighth Circuit Manual of Model Jury Instructions, Section 5.01
. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Federal Rule of Criminal Procedure, Rule 12.1 . . . . . . . 38

Federal Rule of Criminal Procedure, Rule 404(b) . . . . 35, 37

viii

## STATEMENT OF THE ISSUES

    **I.**    **WHETHER 18 U.S.C. § 1959, WHICH PROHIBITS MURDER IN AID OF RACKETEERING ACTIVITY, IS A CONSTITUTIONAL EXERCISE OF CONGRESS' POWER UNDER THE COMMERCE CLAUSE**

United States v. Riddle, 249 F.3d 529 (6th Cir. 2001)

United States v. Torres, 129 F.3d 710 (2d Cir. 1997)

United States v. Marino, 277 F.3d 11 (1st Cir. 2002)

Appellate Case: 03-1067   Page: 10   Date Filed: 07/15/2003 Entry ID: 1665148

## II. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE DEFENDANTS' CONVICTIONS FOR MURDER IN AID OF RACKETEERING ACTIVITY

<u>United States v. Hamilton</u>, 2003 WL 21403162 at *3 (8th Cir. June 2003)

<u>United States v. Francis</u>, 327 F.3d 729 (8th Cir. 2003)

x

### III. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING EVIDENCE OF CRENSHAW'S PRIOR CONVICTIONS

<u>United States v. Williams</u>, 308 F.3d 833 (8th Cir. 2002)

<u>United States v. Howard</u>, 235 F.3d 366 (8th Cir. 2000)

<u>United States v. Frazier</u>, 280 F.3d 835 (8th Cir. 2002)

Appellate Case: 03-1067    Page: 12    Date Filed: 07/15/2003 Entry ID: 1665148

IV. **WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO ORDER DISCLOSURE OF A CONFIDENTIAL INFORMANT WHO WAS NOT A WITNESS TO ANY OF THE ACTS CHARGED IN THE INDICTMENT**

<u>Roviaro v. United States</u>, 353 U.S. 53 (1957)

<u>Carpenter v. Lock</u>, 257 F.3d 775 (8th Cir. 2001)

Appellate Case: 03-1067    Page: 13    Date Filed: 07/15/2003 Entry ID: 1665148

**STATEMENT OF THE FACTS**

On July 20, 1996, defendants Keith Bernard Crenshaw, Timothy Kevin McGruder, and Kamil Hakeem Johnson, all of whom were members or associates of the Rolling 60's Crips street gang, were on a mission to kill members of a rival gang known as the Bogus Boys. T. 344-47, 494. At approximately 10:45 p.m., they spotted some Bogus Boys at an Amoco gas station in St. Paul, Minnesota. They had their getaway driver, Maalik Harut, drop them off a block away. T. 347-48.

Crenshaw, McGruder, and Johnson then proceeded on foot to an alley that was separated from the Amoco station by a six-foot wooden fence. Each of the three defendants had a gun. T. 94, 345. The three of them got up on a guard rail and began shooting over the fence into the gas station parking area where at least 7 Bogus Boys were congregated. E.g., T. 149, 251, 834.

The defendants concentrated their fire on a particular blue Cadillac that was parked at the air hose about 30 feet in front of them. T. 279-80, 834. This car belonged to the girlfriend of one of the Bogus Boys. T. 164, 244-45. That night, the car contained only women and children, including four-year-old Davisha Gillum and her mother, who were getting a ride home after attending the Rondo Days neighborhood celebration in St. Paul. T. 166-71. At least 20 shots rang out. T. 282-83. When the shooting stopped, Davisha's mother and two other adult women from the blue Cadillac lay wounded. T. 252-53.

1

Four-year-old Davisha lay dying in her mother's arms with a bullet hole through her forehead. T. 175, 934. None of the Bogus Boys had been hit.

Crenshaw, McGruder, and Johnson ran back to the waiting getaway car driven by Maalik Harut. T. 348-49. They then sought out the leaders of the Rolling 60's Crips gang in order to inform them that they had just shot at the Bogus Boys. E.g., T. 350-51, 607-09. This was an important part of their mission because the shooting was a gang-ordered hit. T. 587, 680-81. The Rolling 60's Crips and the Bogus Boys had been in a gang war for at least the previous year. T. 595-600. It had escalated months earlier when the Bogus Boys shot and wounded a Rolling 60's member named Richard Smaller. T. 598-99, 769-70. As a result of the ongoing gang warfare, the head of the Rolling 60's Crips, Terron "Rico" Williams, repeatedly had ordered all his gang members to shoot any Bogus Boys on sight. T. 587, 681, 340. Crenshaw, McGruder, and Johnson were carrying out his orders when they shot at the Bogus Boys, missed, and killed Davisha Gillum. T. 681.

Within minutes after the murder, Crenshaw, McGruder, and Johnson found "Rico" Williams and bragged to him about having just shot at the Bogus Boys at the Amoco station. T. 607-09. After bragging to "Rico" Williams, the three defendants continued to brag to other members and associates of the Rolling 60's gang. T. 832-34, 952-59, 1064. McGruder, whose street name is "Handyman," was disappointed because his

2

gun jammed during the shooting, T. 834, 953, 1064, a fact later borne out by ballistics evidence. T. 299-301. When the three defendants found out the next day from news reports that they had killed an innocent four-year-old girl, they stopped bragging. T. 610-12; see also T. 836.

Eyewitnesses at and near the Amoco station described the shooters as three young black males, one of whom was very light- skinned. T. 94, 149. McGruder and Johnson are black males. Crenshaw, whose street name is "Chumley," is a very light-skinned black male. See T. VII at 37. Photospreads of potential suspects were shown to eyewitnesses. The defendants' pictures were not in the initial photospreads because they had not yet been identified as suspects. T. 189, 201-02. Two witnesses picked out photos of people they thought most closely resembled one of the shooters. Those photographs, reproduced in the addendum, are of people who closely resemble defendant McGruder. See T. 125-30; Gov't Addendum at 1-2.

From bullet casings and bullet fragments found at the Amoco station, investigators were able to determine that at least 20 shots were fired from behind the fence. T. 282-83. There was no evidence of any return fire. T. 285. Casings from two different guns were found at the scene. T. 299-301. A ballistics expert testified that one set of casings was fired from a particular type of 9 millimeter pistol manufactured by Heckler & Koch, which is a very rare gun. T. 306-10,

Appellate Case: 03-1067     Page: 16     Date Filed: 07/15/2003 Entry ID: 1665148

316.  The Heckler & Koch pistol had fired Black Talon bullets, a type of ammunition that was banned in 1993 and would have been rather scarce by July 1996.  T. 318-19, 512.  The bullet that killed Davisha Gillum was, in all probability, a Black Talon bullet.  T. 275, 307, 325-26.  Defendant Kamil Johnson's girlfriend in 1996 owned a Heckler & Koch 9 millimeter pistol and Kamil Johnson had access to it.  T. 523-25.  The girlfriend testified that she noticed the gun was missing in late 1996, T. 525-26, which was not long after Davisha Gillum's murder.  She never saw it again.  <u>See</u> T. 526.  Although the gun itself was never found, when investigators searched the girlfriend's apartment in 2002, they found boxes of Black Talon ammunition identical to the expended bullets found at the murder scene.  T. 1193-94.

Despite early leads pointing to the Rolling 60's gang as the perpetrators of the crime, T. 203-04, 238, local homicide investigators were not able to develop a provable case.  Although the shooters had bragged about the crime to several fellow gang members and associates, the gang had a rigidly enforced code of silence.  T. 587-88, 819, 916-17.  Anyone who cooperated with the police would be severely punished or even killed.  T. 588.  No one involved with the gang came forward.

Eventually the investigation was taken over by the FBI Drug Task Force.  T. 1179-80.  Over the next several years, investigators focused their energies on developing a drug case against the leadership of the

4

Rolling 60's Crips gang, including Terron "Rico" Williams and his younger brother Greg Hymes. In late 2001, a federal indictment was returned charging "Rico" Williams, Greg Hymes, and another high-ranking member of the Rolling 60's Crips with federal drug trafficking offenses, including an interstate cocaine trafficking conspiracy spanning 10 years. T. 533-34, 809.

On the very day "Rico" Williams was arrested on the federal drug indictment, he agreed to cooperate with law enforcement in solving the Davisha Gillum murder. T. 614-15. On the day of his arrest, he named the three shooters -- defendants Keith Crenshaw ("Chumley"), Timothy McGruder ("Handyman"), and Kamil Johnson ("Little T-Bone") -- as well as the getaway driver, Maalik Harut. Id.

Investigators then approached Harut. When confronted, Harut immediately confessed that he had been the getaway driver on the night in question. T. 353-54, 1184. He also named Crenshaw, McGruder, and Johnson as the three shooters. Id.

Both "Rico" Williams and Maalik Harut testified against Crenshaw, McGruder, and Johnson at trial pursuant to cooperation plea agreements. Greg Hymes also pleaded guilty and testified against them pursuant to a cooperation plea agreement.[1] The testimony of these three witnesses

---

[1]Williams and Hymes pleaded guilty to federal drug trafficking charges. T. 533, 809. Harut pleaded guilty to conspiracy to commit murder in aid of racketeering activity for his role as the getaway driver. T. 328.

5

was corroborated by two other non-defendant witnesses who overheard Crenshaw, McGruder, and Johnson bragging about the shooting immediately after it occurred. T. 952-56, 1064. The government also presented essentially unchallenged evidence that the Rolling 60's Crips gang constitutes a racketeering enterprise affecting interstate commerce as defined under the relevant statute, and that the perpetrators acted with the requisite motive of gaining entrance to or maintaining or increasing their position in the gang. See parts II.A. and II.C. below.

After a two-week trial, the jury found all three defendants guilty of the single count of murder in aid of racketeering activity. Chief Judge James Rosenbaum sentenced each of them to the statutorily prescribed penalty of life imprisonment. These appeals followed.

6

## SUMMARY OF THE ARGUMENT

Title 18, United States Code, Section 1959, which prohibits murder in aid of racketeering activity, is a constitutional exercise of Congress' power under the Commerce Clause. Section 1959 contains an explicit jurisdictional element requiring proof, on a case-by-case basis, that the activities of the enterprise at issue affected interstate commerce. This feature distinguishes section 1959 from the statute the United States Supreme Court invalidated in United States v. Lopez, 514 U.S. 549 (1995). Every court to consider the constitutionality of section 1959 in the aftermath of Lopez has found it to be constitutional.

The evidence was sufficient to support the defendants' convictions for murdering an innocent four-year-old girl while ambushing members of the rival Bogus Boys gang. The government proved that the defendants' gang -- the Rolling 60's Crips -- constituted an "enterprise" under section 1959, in that it was a structured, hierarchical organization with a defined criminal purpose: to make money for its members primarily through the sale of crack cocaine. The activities of the gang affected interstate commerce because the gang obtained its cocaine -- up to 10 kilograms a month -- in California and other states, smuggling it across state lines for resale in Minnesota.

All of the defendants acted with the requisite motive when they opened fire on the Bogus Boys at the gas station. This was a gang-

7

ordered hit. Committing acts of violence was a way of getting status in the gang; failing to do so when ordered would lead to expulsion from the gang or even worse. The defendants shot at the Bogus Boys in order to maintain or increase their position in the gang, or, in the case of defendant Crenshaw, to gain entrance to the gang. This was confirmed when all three defendants bragged to the leaders of the Rolling 60's gang immediately after the ambush in order to reap the credit they felt was due them.

The District Court did not abuse its discretion in admitting evidence of defendant Crenshaw's prior convictions for second degree assault and reckless discharge of a firearm. The prior convictions were similar to the instant offense, occurred close in time to it, were relevant to material issues, and were not more prejudicial than probative. The District Court gave a proper limiting instruction.

Finally, the District Court did not abuse its discretion in declining to order disclosure of the identity of a confidential informant. The informant did not witness any of the events charged in the indictment, but simply heard one of the government's witnesses make a statement several days after the murder that allegedly was inconsistent with that witness's trial testimony. Disclosure was not required because there were other witnesses who could have been called to testify about the same allegedly inconsistent statement, and because naming the informant would have put his or her life in danger.

Appellate Case: 03-1067    Page: 21    Date Filed: 07/15/2003 Entry ID: 1665148

**ARGUMENT**

## I. 18 U.S.C. § 1959, WHICH PROHIBITS MURDER IN AID OF RACKETEERING ACTIVITY, IS A CONSTITUTIONAL EXERCISE OF CONGRESS' POWER UNDER THE COMMERCE CLAUSE

Defendant Timothy McGruder challenges the constitutionality of 18 U.S.C. § 1959, which prohibits murder in aid of racketeering activity. He claims the statute is unconstitutional on its face and as applied because Congress allegedly exceeded its power under the Commerce Clause in enacting it.  Because McGruder failed to raise this issue in the district court, the standard of review is plain error.[2]  <u>United States v. Letts</u>, 264 F.3d 787, 789 (8th Cir. 2001), <u>cert. denied</u>, 535 U.S. 908 (2002).

Section 1959 is a constitutional exercise of Congress' power under the Commerce Clause.  Section 1959 provides in relevant part as follows:

_____

[2]McGruder did not file a pretrial motion attacking the constitutionality of section 1959, and did not join in co-defendant Johnson's motion raising the claim even when given the opportunity at the motions hearing.  T. Motions at 14-17; <u>see also</u> Designated Record (D.R.) at 5, 15 (McGruder not part of constitutional challenge).  The Magistrate Judge recommended that Johnson's constitutional challenge be rejected.  <u>Id.</u> at 16. McGruder attempted to raise the constitutional issue for the first time in his objections to the Report and Recommendation, D.R. at 25, but the government pointed out that he had no standing to object because he had never joined in his co-defendant's constitutional claim.  <u>Id.</u> at 30.  Meanwhile, Johnson abandoned the claim by not objecting to the Report and Recommendation on that ground.  The District Court then summarily denied Johnson's constitutional challenge.  <u>Id.</u> at 43.

9

> Whoever, as consideration for the receipt
> of, or as consideration for a promise or
> agreement to pay, anything of pecuniary value
> from an enterprise engaged in racketeering
> activity, or for the purpose of gaining entrance
> to or maintaining or increasing position in an
> enterprise engaged in racketeering activity,
> murders . . . any individual in violation of the
> laws of any State or the United States, or
> attempts or conspires so to do, shall be [guilty
> of an offense against the United States].

18 U.S.C. § 1959(a)(1).

The statute further defines the term "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, <u>which is engaged in, or the activities of which affect, interstate or foreign commerce</u>." 18 U.S.C. § 1959(b)(2). (Emphasis added).

Thus, an element of the offense is that the activities of the enterprise must affect interstate commerce. This distinguishes Section 1959 from the statutes the Supreme Court invalidated in the cases McGruder relies upon: <u>United States v. Lopez</u>, 514 U.S. 549 (1995), and <u>United States v. Morrison</u>, 529 U.S. 598 (2000). In <u>United States v. Lopez</u>, the Supreme Court struck down the Gun Free School Zones Act, 18 U.S.C. § 922(q) (1994), because the statute lacked a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce." <u>Lopez</u>, 514 U.S. at 561. Likewise, in <u>Morrison</u>, the Supreme Court found the same defect

10

with respect to the Violence Against Women Act. <u>Morrison</u>, 529 U.S. at 613 ("like the . . . Act at issue in <u>Lopez</u>, [the VAWA] contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce.")

The defect identified in <u>Lopez</u> is not present in 18 U.S.C. § 1959, which does contain the required jurisdictional element. For this reason, every court to consider the constitutionality of Section 1959 in the aftermath of <u>Lopez</u> has upheld the statute as a proper exercise of Congress' power under the Commerce Clause. <u>United States v. Riddle</u>, 249 F.3d 529, 538 (6th Cir. 2001), <u>cert. denied</u>, 534 U.S. 930 (2001); <u>United States v. Torres</u>, 129 F.3d 710, 717 (2d Cir. 1997); <u>United States v. Muyet</u>, 994 F. Supp. 550, 563-64 (S.D.N.Y. 1998); <u>see also</u> <u>United States v. Marino</u>, 277 F.3d 11, 34-35 (1st Cir. 2002), <u>cert. denied</u>, 536 U.S. 948 (2002). <u>Cf.</u> <u>United States v. Kehoe</u>, 310 F.3d 579, 588 (8th Cir. 2002) (section 1959 does not violate the Tenth Amendment), <u>cert. denied</u>, 123 S. Ct. 2112 (2003).[3]

---

[3]Section 1959 is an adjunct to the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 <u>et</u> <u>seq</u>. The jurisdictional element in the RICO statute is virtually identical to the jurisdictional element in section 1959. Since <u>Lopez</u>, every court that has considered the issue has held that RICO constitutes a valid exercise of Congress' powers under the Commerce Clause as well. <u>United States v. Freqa</u>, 179 F.3d 793, 800-01 (9th Cir. 1999); <u>United States v. Juvenile Male</u>, 118 F.3d 1344, 1347-49 (9th Cir. 1997); <u>United States v. Maloney</u>, 71 F.3d 645, 662-63 (7th Cir. 1995).

Appellate Case: 03-1067    Page: 24    Date Filed: 07/15/2003 Entry ID: 1665148

So long as the predicate activities of the enterprise affect interstate commerce, there is no additional requirement that the violent crimes committed in aid of those activities must also affect interstate commerce. <u>Riddle</u>, 249 F.3d at 537; <u>United States v. Feliciano</u>, 223 F.3d 102, 117-19 (2d Cir. 2000); <u>United States v. Mapp</u>, 170 F.3d 328, 336 (2d Cir. 1999); <u>United States v. Torres</u>, 129 F.3d 710, 717 (2d Cir. 1997); <u>United States v. Riley</u>, 985 F. Supp. 405, 409 (S.D.N.Y. 1997). Furthermore, the enterprise's activities need only have a <u>de</u> <u>minimis</u> impact on interstate commerce. <u>Marino</u>, 277 F.3d at 35; <u>Riddle</u>, 249 F.3d at 537; <u>Feliciano</u>, 223 F.3d at 119; <u>United States v. Gray</u>, 137 F.3d 765, 773 (4th Cir. 1998); <u>United States v. Juvenile Male</u>, 118 F.3d 1344, 1348-49 (9th Cir. 1997).[4]

In the present case, the indictment alleged the requisite effect on interstate commerce and the jury properly was instructed as to that element. T. VIII at 17, 19.

---

[4]Under <u>Lopez</u>, purely <u>intrastate</u> activity can be regulated federally only if such activity, in the aggregate, "substantially affects" interstate commerce. The "substantial effects" requirement does not apply to the regulation of <u>interstate</u> economic activity. <u>E.g.</u>, <u>United States v. Robertson</u>, 514 U.S. 669, 671 (1995) (per curiam); <u>United States v. Page</u>, 167 F.3d 325, 335 (6th Cir. 1999). Because a section 1959 enterprise must, by definition, affect interstate commerce, the statute does not regulate purely intrastate activity and the "substantial effects" test is therefore inapplicable.

Appellate Case: 03-1067     Page: 25     Date Filed: 07/15/2003 Entry ID: 1665148

Because 18 U.S.C. § 1959 is clearly constitutional on its face, the District Court did not commit plain error by failing to hold otherwise.

McGruder also claims that Section 1959 is unconstitutional as applied to him. Apparently, he is alleging that the government did not sufficiently prove the requisite effect on interstate commerce. This is a sufficiency of the evidence argument, <u>e.g.</u>, <u>Riddle</u>, 249 F.3d at 536, and is addressed in Part II. B. below.

13

Appellate Case: 03-1067    Page: 26    Date Filed: 07/15/2003 Entry ID: 1665148

## II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE DEFENDANTS' <u>CONVICTIONS FOR MURDER IN AID OF RACKETEERING ACTIVITY</u>

All three defendants allege that the evidence was insufficient to support their convictions for murder in aid of racketeering activity. The standard of review of such a claim is very strict. <u>E.g.</u>, <u>United States v. Hamilton</u>, 2003 WL 21403162 at *3 (8th Cir. June 19, 2003). This Court must view the evidence "in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." <u>Id.</u> The verdict must be upheld if "there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." <u>Id.</u>; <u>see also</u> <u>United States v. Francis</u>, 327 F.3d 729, 733 (8th Cir. 2003).

The elements of murder in aid of racketeering activity are:

(1) that the enterprise [the Rolling 60's Crips gang], existed at the time charged in the indictment;

(2) that the enterprise was engaged in racketeering activity as defined in 18 U.S.C. Section 1961(1) [that section states that "racketeering activity" includes "dealing in a controlled substance"];

(3) that the enterprise was engaged in, and/or its activities affected, interstate or foreign commerce;

(4) that the defendant, acting with the requisite intent, committed murder;

(5) that the defendant committed the murder for any one or more of the following motives:

14

> (a) for pecuniary value,
>
> (b) for the purpose of gaining entrance to, or for maintaining or increasing the defendant's position in the enterprise;
>
> > (6) that the underlying murder violated a specific federal or state statute.

18 U.S.C. § 1959(a); see United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994).

The defendants (some or all of them) challenge the government's proof of the first, third, fourth, and fifth elements. As shown below, each of these challenges should be rejected.

### A. **The Rolling 60's Crips Gang Constituted a RICO Enterprise**

Defendant McGruder contends the government did not prove the Rolling 60's Crips gang constituted a RICO enterprise. McGruder did not contest this element at trial, nor did anyone else.

In considering the "enterprise" element, this Court has held that that the evidence must show the existence of an enterprise that is "separate and apart from the pattern of criminal activity in which it engages." United States v. Davidson, 122 F.3d 531, 534 (8th Cir. 1997). This Court looks to the following factors: (1) a common purpose; (2) a formal or informal organization of the participants in which they function as a unit; and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. United States v. Darden, 70 F.3d 1507, 1520 (8th Cir. 1995). "The function of overseeing and coordinating the commission of several

15

different predicate offenses and other activities on an ongoing basis is adequate to satisfy the separate existence requirement." _Id_. at 1521 (_quoting_ _United States v. Kragness_, 830 F.2d 842, 857 (8th Cir. 1987)). "Family and social relationships" can define a criminal RICO enterprise. _Davidson_, 122 F.3d at 535. Evidence of "a pattern of roles and a continuing system of authority" also can establish the enterprise requirement. _Davidson_, 122 F.3d at 535. Street gangs have been held to constitute RICO enterprises. _E.g._, _Darden_, 70 F.3d at 1521. The jury properly was instructed as to this element. T. VIII at 18. The defendants do not challenge the instruction.

Applying these principles, the Rolling 60's Crips gang easily constituted a RICO enterprise. The gang was a structured criminal organization with a defined leadership, purpose, and rules. Terron "Rico" Williams was the leader of the gang. T. 541. Other senior members of the gang held leadership positions as well. T. 546-47, 818. Collectively, the leaders were referred to as the "inner circle." T. 576, 818.

The gang had an initiation procedure for prospective members. Known as "jumping in," the initiation required the prospective member to go in a circle and fight one or more existing members in order to prove himself. T. 538, 581.

The gang had defined rules. One of the most important rules was the rule of mandatory retaliation. If someone outside the gang harmed

16

a member of the Rolling 60's, all the members of the gang were required to retaliate against that person. T. 584, 819. Committing acts of violence for the benefit of the gang was a way of getting status in the gang. T. 494, 585. Conversely, failure to retaliate when called upon would cause one to lose status and also subject that member to punishment, up to and including death. T. 584-85, 819.

The other main rule was the code of silence. T. 587-88, 819, 916-17. No member of the gang could talk to the police about the gang's activities. T. 588. A violation of this rule was also punishable by death. T. 588.

During the time period at issue, the Rolling 60's gang held meetings on a regular basis. T. 584-86. Smaller meetings were held at "Rico" Williams' residence at 910 Edmund in St. Paul, Minnesota. T. 585. As the membership grew, the meetings were moved to the football field at Central High School in St. Paul, Minnesota. T. 586. As many as 200 gang members attended the meetings at the school. T. 586. The agenda included such topics as the gang's drug business, its need for internal discipline, and its ongoing war with the rival Bogus Boys gang. T. 586-87.

The purpose of the gang was to make money for its members through criminal activity, primarily the sale of crack cocaine. T. 541-45. "Rico" Williams was in charge of obtaining the cocaine from his out-of-state sources of supply. T. 541-42. He would typically get 5

17

kilograms at a time, usually twice a month.  T. 543, 640.  Once he got the cocaine to Minnesota by couriers or through the mail, he would dole it out to the members of his gang for further distribution.  T. 543-44.  The drug profits would be returned to "Rico" Williams to be invested in a new shipment of cocaine.  T. 545.  The Rolling 60's had a defined drug territory in St. Paul that they tried to control.  T. 544.  In addition to drug sales, several of the gang's members also committed a series of armed robberies.  T. 577-79; 825-26.

Contrary to McGruder's argument that the Rolling 60's Crips was just a "loose group of individuals who occasionally cooperated to commit crime," McGruder Brief at 21, the evidence showed that the gang was a structured, hierarchical organization that engaged in coordinated criminal activity over a number of years.  The enterprise element was amply proven.

## B.   The Activities of the Enterprise Affected Interstate Commerce

Defendant Johnson contends the evidence was insufficient to show that the activities of the Rolling 60's Crips affected interstate commerce.  Once again, no one contested this element at trial.  Johnson now argues that the government had to prove that the murder of Davisha Gillum itself affected interstate commerce, and further that the effect on interstate commerce was "close and substantial."  Johnson Brief at 29.  But Johnson did not request a jury instruction to that effect, nor did he object to the District Court's instruction that the effect on

Appellate Case: 03-1067   Page: 31   Date Filed: 07/15/2003 Entry ID: 1665148

interstate commerce of the gang's activities need only be "minimal."
T. VIII at 19.[5] Thus, the standard of review is whether the District
Court's instruction constituted plain error. <u>United States v. Letts</u>,
264 F.3d 787, 789 (8th Cir. 2001); <u>United States v. Brown</u>, 330 F.3d
1073, 1078 (8th Cir. 2003).

Johnson's argument that the government was required to prove that
the murder itself had a close and substantial impact on interstate
commerce should be rejected. Johnson bases his argument solely on the
Supreme Court's decision in <u>United States v. Lopez</u>, 514 U.S. 549
(1995). As shown in part I, however, <u>Lopez</u> is not controlling. <u>Lopez</u>
involved the Gun Free Schools Act. The defect in the statute was that
it lacked a jurisdictional element requiring case-by-case proof that
the activity to be regulated affected interstate commerce. 514 U.S. at
561. Lacking such a jurisdictional element, the Supreme Court held
that the statute could be upheld only if the activity to be proscribed
-- possession of guns in a school zone -- had a close and substantial
effect on interstate commerce. The Supreme Court concluded that it did
not. <u>Id.</u>

Contrary to Johnson's argument, 18 U.S.C. § 1959 does contain a
jurisdictional element. The statute requires that the enterprise

---

[5]The latter point is based on counsel's recollection. As of
this writing, the transcript of the jury instruction conference
has not yet been received. The government ordered it on July 9,
2003, when it realized it had not been prepared with the rest of
the trial transcript.

Appellate Case: 03-1067    Page: 32    Date Filed: 07/15/2003 Entry ID: 1665148

either be engaged in interstate commerce or that its activities affect interstate commerce.  18 U.S.C. § 1959(b)(2).  <u>Lopez</u> is therefore distinguishable.

Numerous decisions since <u>Lopez</u> establish that, in the section 1959 context, so long as the predicate activities of the enterprise affect interstate commerce, there is no additional requirement that the violent crimes committed in aid of those activities must also affect interstate commerce. <u>United States v. Riddle</u>, 249 F.3d 529, 537 (6th Cir. 2001); <u>United States v. Feliciano</u>, 223 F.3d 102, 117-19 (2d Cir. 2000); <u>United States v. Mapp</u>, 170 F.3d 328, 336 (2d Cir. 1999); <u>United States v. Torres</u>, 129 F.3d 710, 717 (2d Cir. 1997); <u>United States v. Riley</u>, 985 F. Supp. 405, 409 (S.D.N.Y. 1997).  Furthermore, only a <u>de minimis</u> impact on interstate commerce is required.  <u>United States v. Marino</u>, 277 F.3d 11, 35 (1st Cir. 2002); <u>Riddle</u>, 249 F.3d at 537; <u>Feliciano</u>, 223 F.3d at 117; <u>United States v. Juvenile Male</u>, 118 F.3d 1344, 1348 (9th Cir. 1997); <u>United States v. Gray</u>, 137 F.3d 765, 773 (4th Cir. 1998).

With the proper test in mind, the government amply proved the requisite effect on interstate commerce.  The evidence showed that the Rolling 60's Crips gang was an interstate drug trafficking organization.  The drugs were obtained in California, Louisiana, and other states, then smuggled into Minnesota either by human couriers or through commercial shippers.  T. 542-46, 818.  The interstate drug

20

shipments typically consisted of five kilograms of cocaine at a time. T. 543. The money to purchase these drugs -- $22,000 per kilogram -- also was transported across state lines. T. 545, 731. This interstate drug trafficking went on for at least 6 years prior to the murder, T. 540-41, and for several years thereafter. <u>See</u> T. 533. These facts were not contested at trial. Courts have long held that drug trafficking inherently affects interstate commerce. <u>United States v. Vasquez</u>, 267 F.3d 79, 86 (2d Cir. 2001), <u>cert. denied</u>, 534 U.S. 1148 (2002); <u>United States v. Feliciano</u>, 223 F.3d 102, 118-19 (2d Cir. 2000); <u>United States v. Miller</u>, 116 F.3d 641, 674 (2d Cir. 1997). Proof that the enterprise trafficked in controlled substances that were imported across state lines satisfies the interstate commerce element. <u>United States v. Gray</u>, 137 F.3d 765, 772 (4th Cir. 1998); <u>United States v. Thomas</u>, 114 F.3d 228, 253 (D.C. Cir. 1997). The interstate commerce element was met.

### C. **The Defendants Acted With the Required Motive**

Section 1959 requires that the murder be committed either for pecuniary value or for the purpose of gaining entrance to or maintaining or increasing the defendant's position in the enterprise. Where the evidence shows that the commission of violent acts was expected by virtue of one's membership in the gang, the necessary motive can be inferred. <u>United States v. Mapp</u>, 170 F.3d 328, 336 (2d Cir. 1999); <u>United States v. Tipton</u>, 90 F.3d 861, 891 (4th Cir. 1996),

21

cert. denied, 117 S.Ct. 2414 (1997); United States v. Fiel, 35 F.3d 997, 1004 (4th Cir. 1994).  There is no requirement that the violent acts be in furtherance of the underlying racketeering activity, such as drug trafficking.  Fiel, 35 F.3d at 1005.  A defendant need not be motivated solely by the purpose of maintaining or increasing his position in the enterprise.  United States v. Fairchild, 122 F.3d 605, 612 (8th Cir. 1997).

All three defendants acted with the requisite motive.  McGruder and Johnson were existing members of the Rolling 60's Crips gang at the time of the murder.  T. 547-48; see also T. 492. Like all members, they had been indoctrinated in the rules of the gang, including the rule of mandatory retaliation.  T. 584, 819.  They knew the Rolling 60's Crips were in a gang war with a rival gang, the Bogus Boys.  They knew the head of the Rolling 60's Crips, Terron "Rico" Williams, had put out an order that any Bogus Boys members were to be shot on sight.  T. 587, 340, 415.  The evidence showed that the defendants were carrying out that order when they shot at some Bogus Boys at the Amoco gas station and killed Davisha Gillum.  T. 681.  They acted to maintain and/or increase their position in the gang.  Committing acts of violence was a way of getting status in the gang.  T. 494, 585.  Failing to commit acts of violence when directed to do so would result in loss of status as well as punishment.  T. 584-85, 819. Getaway driver Maalik Harut summed it up when he testified that he participated in the mission to

Appellate Case: 03-1067    Page: 35    Date Filed: 07/15/2003 Entry ID: 1665148

kill Bogus Boys that night because he would not have been able to even hang around the gang any longer if he failed to do what was expected of him. T. 495.

Defendant Crenshaw was not yet a full-fledged member of the Rolling 60's at the time of the murder but was a close associate. T. 549. He did not need to be a member in order to be liable under section 1959. <u>United States v. Rolett</u>, 151 F.3d 787, 790 (8th Cir. 1998) ("it was not necessary [under section 1959] to prove that appellant was himself a part of the enterprise engaged in racketeering activity"). Section 1959 reaches those who commit murder in order to get into a gang, as well as those who do it to maintain or increase their position in the gang. 18 U.S.C. § 1959(a). Crenshaw had been a member of two other gangs previously: the 187 gang and the ABK gang. T. 549, 564. "187" is the California penal code section for murder. T. 549. ABK stands for "Anybody Killer." T. 564. Just prior to the murder, Crenshaw had met Roosevelt Sanders, one of the senior members of the Rolling 60's Crips, while the two of them were in prison together. T. 582-84, 638. When Crenshaw and Sanders got out of prison, Crenshaw began hanging around with the Rolling 60's gang "all the time" and began participating in its activities. T. 549. On the same night that Crenshaw shot at the Bogus Boys from behind the Amoco station, Sanders shot at the Bogus Boys at a different location. T. 827-29. From these facts, the jury reasonably could infer that

23

Crenshaw was motivated, at least in part, to participate in the war against the Bogus Boys in order to impress the leaders of the Rolling 60's and thereby gain acceptance into that gang. Like everyone else involved in the Rolling 60's, Crenshaw participated because it was expected of him.

The best evidence that all three defendants acted with the requisite motive of gaining entrance to or maintaining or increasing their position in the gang is that, immediately following the shooting, they all sought out the leaders of the Rolling 60's gang in order to inform them of the news. T. 350-51, 608-09, 834-37. They bragged about the shooting to people in the gang who mattered because they wanted to make sure they would get "stripes" for committing violence on behalf of the gang. <u>See</u> T. 585.

Defendant McGruder's claim that he lacked the requisite motive is particularly unconvincing because the evidence showed that McGruder participated in at least one other drive-by shooting for the benefit of the gang a year prior to this murder. T. 591-95. After one of the Rolling 60's members got beat up by some members of the rival Gangster Disciples gang in April 1995, several Rolling 60's members planned a retaliatory drive-by shooting to be conducted after nightfall. <u>Id.</u> McGruder and another Rolling 60's member, "Fat Will," couldn't wait. They went out and did the drive-by shooting without waiting for the others, only to get caught by the police. <u>Id.</u>; T. 787-92.

Appellate Case: 03-1067   Page: 37   Date Filed: 07/15/2003 Entry ID: 1665148

Even if it could be shown that a particular defendant did not act with the requisite motive, which is not the case, that would not require reversal. So long as at least one of the participants acted with the requisite motive, any defendant who aided and abetted the crime is liable under section 1959 as well. Eighth Circuit Manual of Model Jury Instructions § 5.01; United States v. Concepcion, 983 F.2d 369, 383-84 (2d Cir. 1992).

All three defendants aided and abetted each other when they proceeded as a group to the fence behind the Amoco station and opened fire. It is unlikely that any of them would have tried to ambush two carloads of Bogus Boys by himself. They needed each other to accomplish their mission. It is no defense that they missed the Bogus Boys and killed an innocent four-year-old girl instead. The intent to kill the Bogus Boys transfers to the actual victim who died. Concepcion, 983 F.2d at 381-82.

**D.   Each of the Defendants Participated in the Murder**

Each of the defendants contends the government failed to prove that he participated in the murder of Davisha Gillum. As shown below, the evidence was fully sufficient in this respect.

Getaway drive Maalik Harut testified that he went to the Rondo Days celebration where he met up with his friend and fellow Rolling 60's member Kamil Johnson. T. 341. They attended the drill team competition together, which ended about 9:30 p.m. T. 342. As they

25

were leaving the Central High School stadium where the drill team competition had been held, they were joined by Keith Crenshaw and Timothy McGruder. T. 342.

Harut testified that he and the three defendants decided to go looking for Bogus Boys to shoot. T. 344-47, 494. Harut knew that "Rico" Williams, the leader of the Rolling 60's, had put out an order to shoot Bogus Boys on sight. T. 340. He and Kamil Johnson were at the gang meeting when the order was given. T. 414-15. He and Johnson had discussed the order before. T. 340.

Harut was driving his blue Buick Regal with Crenshaw, McGruder and Johnson as the passengers. T. 344-45. Crenshaw, McGruder, and Johnson each had a gun, T. 345, although Harut did not actually see any guns until after the shooting. T. 412-13. After a stop at Harut's residence, the four of them began looking for Bogus Boys to shoot. T. 345-47, 494.

As Harut was driving down University Avenue, one of the passengers spotted some Bogus Boys in the parking lot of the Amoco gas station at University and Hamline. T. 347. Harut drove around the block and dropped the other three off. T. 347-48. Crenshaw, McGruder and Johnson went between some houses toward the Amoco station a half block away. T. 348. A short while later, Harut heard gun shots. T. 348. Crenshaw, McGruder, and Johnson then came running back to the car. They were talking excitedly about having just shot at the Bogus Boys at

26

the Amoco station.  T. 348-49.  McGruder said something about his gun having jammed.  T. 349.  Harut then sped away from the scene.  T. 349. He drove through an alley where he believes that one or two of the guns, including McGruder's, was dumped.  T. 349.

Harut testified that the four of them then drove to the Hanover apartment complex to tell "Rico" Williams what they had just done.  T. 350.  All four of them went in the apartment.  T. 350.  Crenshaw, McGruder and Johnson began bragging to the people present about having just shot at the Bogus Boys.  T. 351.  Harut recalled that "Rico" Williams was one of the people there.  T. 350.

Harut also testified that Johnson carried a Heckler & Koch 9 millimeter handgun in the summer of 1996.  T. 490.  It belonged to Johnson's girlfriend, Patricia Banks.  T. 490, 492.  Independent ballistics evidence showed that one of the murder weapons was a Heckler & Koch 9 millimeter handgun, which is an extremely rare type of gun. T. 306-10, 316.  Patricia Banks confirmed that she did in fact have such a gun during the summer of 1996 and that her then-boyfriend, Kamil Johnson, had access to it.  T. 523-25; <u>see also</u> T. 506-13.  The gun was silver (nickel finish) with a black grip.  T. 510.  An eyewitness at the Amoco station saw one of the shooters behind the fence holding a silver gun with a black grip.  T. 149.  From where the eyewitness was standing, he would not have been able to see the gun's grip unless the

27

shooter was holding the gun in his left hand. T. VII at 149. Kamil Johnson is left handed. T. 1363.

Harut's eyewitness account was corroborated by several other witnesses. "Rico" Williams confirmed that Crenshaw, McGruder, and Johnson bragged to him about having shot at the Bogus Boys at the Amoco station shortly after it occurred. T. 607-08. The only difference from Harut's account was that "Rico" Williams said he first heard about it in the parking lot at the Hanover apartments, rather than inside the apartment itself. T. 607-08.

"Rico" Williams also testified about the events that led up to the shooting. The Rolling 60's Crips had been in a gang war with the Bogus Boys for at least the previous year. T. 595-99. It started when Bogus Boys members stole some of "Rico" Williams' cars. T. 595. The conflict escalated into a shooting war with the Bogus Boys. T. 595-98. "Rico" Williams candidly admitted he had shot at several of the Bogus Boys on earlier occasions, wounding at least two of them. T. 597, 717-18. He testified that, about the time the Bogus Boys shot and seriously wounded Rolling 60's member Richard Smaller, he ("Rico" Williams) put out an order to all of his gang members to shoot Bogus Boys on sight. T. 598-600, 587. The order was repeated at every weekly gang meeting. T. 681. During these gang meetings, Rolling 60's members also were given descriptions of cars known to be used by the Bogus Boys. T. 600. This included the description of the car the

28

Bogus Boys used when they shot Richard Smaller; namely, a blue Cadillac. T. 824. Davisha Gillum was riding in a blue Cadillac belonging to a girlfriend of one of the Bogus Boys when she was murdered. E.g., T. 164, 244.

Three other witnesses were at the Hanover apartments when Crenshaw, McGruder, and Johnson came in and started bragging about having shot at the Bogus Boys at the Amoco station. Gregory Hymes, Diane Williams, and Lavern Christopher each testified that Crenshaw, McGruder and Johnson came into the apartment along with Maalik Harut bragging about what they had just done. T. 832-34, 952-959, 1064. Greg Hymes remembered Crenshaw bragging that he targeted the blue Cadillac. T. 834. Diane Williams remembered McGruder complaining about his gun jamming. T. 954. She also heard Kamil Johnson say he heard a lady at the Amoco station say, "my baby, my baby." T. 954.

The defendants challenge the credibility of the government's witnesses, highlighting, as they did at trial, discrepancies between the testimony of two or more witnesses, and alleged bias on the part of some of the witnesses. The short response is that all of these alleged problems with the government's evidence were thoroughly exploited by the defense attorneys on cross-examination, vigorously argued by them in closing, and responded to by the United States in rebuttal. Ultimately, it was "the sole province of the jury to weigh the credibility of [the] witness[es]." United States v. Enriquez, 201 F.3d

29

Appellate Case: 03-1067   Page: 42   Date Filed: 07/15/2003 Entry ID: 1665148

1072, 1074 (8th Cir. 2000). The jury's implicit determination that the witnesses were telling the truth is virtually unreviewable on appeal. <u>United States v. Exson</u>, 328 F.3d 456, 459 (8th Cir. 2003).

Furthermore, the defense attorneys were rather inconsistent in their criticism of the government's witnesses. On the one hand, they accused the witnesses of colluding on a story to falsely implicate the defendants. On the other hand, they pointed to discrepancies between the testimony of two or more witnesses as evidence that the witnesses were not telling the truth. The discrepancies, however, proved that the witnesses had not colluded. For example, Greg Hymes testified that his impression after hearing the defendants bragging was that Maalik Harut, the getaway driver, was a shooter as well. T. 835, 916. Hymes acknowledged at trial that this was merely an assumption on his part, <u>id.</u>, and other evidence established that Harut stayed with the getaway car and did not shoot. <u>E.g.</u>, T. 108, 956. This discrepancy simply showed that the witnesses had not colluded and had not been coached. Other discrepancies, such as whether "Rico" Williams first learned of the shooting inside the Hanover apartment or in the parking lot of the complex, were minor matters which were easily explained as innocent misrecollections resulting from the passage of six years between the murder and the trial.

McGruder and Crenshaw presented alibi defenses, but their alibi witnesses were not credible. For example, McGruder relied on the

Appellate Case: 03-1067    Page: 43    Date Filed: 07/15/2003 Entry ID: 1665148

testimony of Kevin Foote, who claimed that McGruder was at Foote's house at the time of the murder. T. 1304. But Foote also claimed that he (Foote) had never been a gang member and had no criminal history. T. 1295. The government showed that Foote was lying on both points. T. VII at 6, 13, 23. Foote had been involved in gang-related shootings himself. T. VII at 5-6, 25-26. Likewise, Crenshaw called his longtime girlfriend Twanda McCoy to testify that Crenshaw was home with her at the time of the murder. T. 1342. But her story was not consistent with Crenshaw's own account of his activities on the day in question. T. VII at 1381-82. It was not even consistent with McCoy's own previous version of Crenshaw's activities. Id. 1382-83. In addition, the jury heard evidence that McCoy had provided a false alibi for Crenshaw on another occasion as well. T. 1350-54.

Defendant Kamil Johnson's contention that eyewitnesses at or near the scene of the Amoco station exclude him as a participant in the shooting is not accurate. One witness saw the three shooters running back to the getaway car. T. 93-94. He said they were three black males, one of whom was light skinned (like Crenshaw). T. 94. Asked about their height, he testified "I guess about six feet, maybe." T. 93. The fact that Kamil Johnson is a few inches shorter than six feet does not exclude him as a participant given the witness's uncertainty. Another witness from the Amoco parking lot said he thought two of the three shooters were about six feet tall, even though they were standing

31

behind a fence and he could only see their heads and shoulders. T. 207-10, 239. This witness obviously does not exclude Johnson as a shooter. Two witnesses picked out photographs of people they said looked like one of the shooters they saw behind the fence. These photographs closely resemble defendant McGruder. Gov't Addendum at 1-2. These witnesses did not exclude Kamil Johnson because Johnson's picture was not in the photospread. T. 189, 204. Another witness thought that <u>two</u> of the three shooters had guns in their right hand, but wasn't sure. T. 1367. The fact that Johnson is left-handed, does not exclude him as a shooter. To the contrary, a different witness was able to describe the color of the grip on the pistol Johnson was shooting that night. T. 149. From where the witness was positioned, he could only have seen the grip if the gun had been in the shooter's left hand. T. VII at 149.

The evidence was more than sufficient to sustain the defendants' convictions.[6]

_____

[6]Johnson also contends the District Court abused its discretion in denying his motion for a new trial. This argument merely restates Johnson's claim that the evidence was insufficient. For the reasons set forth above, this argument should be rejected.

Appellate Case: 03-1067     Page: 45     Date Filed: 07/15/2003 Entry ID: 1665148

### E. Minnesota's Accomplice Corroboration Jury Instruction <u>does not Apply in a Federal Trial</u>

Defendant McGruder contends the Court should have instructed the jury that, under Minnesota law, testimony of an accomplice must be corroborated by other independent evidence. McGruder Brief at 23. However, McGruder never requested such an instruction at trial. The standard of review therefore is whether the District Court committed plain error in failing to give such an instruction. <u>United States v. Brown</u>, 330 F.3d 1073, 1078 (8th Cir. 2003).

There was no error, plain or otherwise, in failing to give Minnesota's accomplice corroboration instruction. The same argument was made and rejected in <u>United States v. Kehoe</u>, 310 F.3d 579 (8th Cir. 2002), another section 1959 murder prosecution. This Court first noted that "'Congress did not intend to incorporate the various states's (sic) procedural and evidentiary rules into the RICO statute.'" <u>Kehoe</u>, 310 F.3d at 588 (quoting <u>United States v. Carrillo</u>, 229 F.3d 177, 183 (2d Cir. 2000)). This Court further observed that "[state] procedural rules generally do not govern a federal trial." <u>Id.</u> at 591. The only reason such a rule was applicable at all in <u>Kehoe</u> was because the government did not object to the instruction, based on Arkansas law, that accomplice testimony must be corroborated by independent evidence. <u>Id.</u>

In the present case, the government never was called upon to object to such an instruction because neither McGruder nor any other

Appellate Case: 03-1067    Page: 46    Date Filed: 07/15/2003 Entry ID: 1665148

defendant ever requested it.  Because <u>Kehoe</u> establishes that such an instruction is not required, the District Court did not commit plain error by failing to give such an instruction <u>sua</u> <u>sponte</u>.

Even if Minnesota's accomplice corroboration rule were applicable, the testimony of accomplice Maalik Harut was amply corroborated.  For example, four other witnesses heard Crenshaw, McGruder, and Johnson bragging about the shooting at the Amoco station shortly after it occurred.  T. 607, 832-34, 952-59, 1064. Ballistics evidence showed that one of the murder weapons was a Heckler and Koch 9 millimeter pistol, an extremely rare type of gun that Kamil Johnson had access to in the summer of 1996.  T. 306-10, 316, 523-25.

Appellate Case: 03-1067    Page: 47    Date Filed: 07/15/2003 Entry ID: 1665148

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF CRENSHAW'S PRIOR CONVICTIONS

Crenshaw contends the District Court should not have admitted evidence of his 1995 conviction for second degree assault. He also claims the government should not have been allowed to inquire into another conviction for reckless discharge of a firearm during its cross-examination of Crenshaw's alibi witness. For the following reasons, the District Court did not abuse its discretion in admitting this evidence subject to a proper limiting instruction. E.g., United States v. Tomberlin, 130 F.3d 1318, 1320 (8th Cir. 1997) (admission of Rule 404(b) evidence is reviewed for abuse of discretion).

Other crimes evidence is admissible under Rule 404(b) if it is (1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) supported by sufficient evidence; and (4) such that its probative value is not outweighed by any prejudicial impact. E.g., United States v. Williams, 308 F.3d 833, 837 (8th Cir. 2002). A district court's admission of Rule 404(b) evidence will be reversed "only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." Id. (quoting United States v. Howard, 235 F.3d 366, 372 (8th Cir. 2000)).

Evidence of Crenshaw's 1995 conviction for second degree assault was relevant because this was the sentence Crenshaw was serving when he met Rolling 60's member Roosevelt Sanders in prison. T. 582-84; see

35

<u>also</u> T. 572.  This relationship with Sanders in turn helped prove Crenshaw's motive for participating in the shooting that killed Davisha Gillum.  Crenshaw met Sanders in prison, started hanging around with Sanders and the Rolling 60's Crips gang upon his release, and participated in the shooting at the Amoco station in order to prove himself and thereby gain status in the Rolling 60's gang.  The prior offense was similar in kind to the instant offense.  On both occasions, Crenshaw carried a firearm in a public place and shot another person.  The prior conviction was close in time to the instant offense -- about 18 months earlier.[7]  The prior conviction was proven by sufficient evidence: a certified copy of the judgment.  T. 1251.

Finally, any potential prejudice from the prior conviction did not substantially outweigh its probative value.  The judgment was introduced without fanfare or extended comment at the end of the government's case-in-chief.  T. 1251.  In closing argument, the prosecutor referred to it only briefly in commenting on the credibility of Crenshaw's alibi witness.  T. VII at 50.  Elsewhere the prosecutor emphasized that prior crimes evidence does <u>not</u> prove the charges in this case.  T. VII at 140.  The District Court gave a proper limiting instruction, also emphasizing that the jury could not use the evidence as any proof that Crenshaw committed the acts charged in the

---

[7]Crenshaw's brief (pp. 44-45) erroneously states that the conviction occurred in 1993.  The actual date was January 13, 1995.

36

Appellate Case: 03-1067   Page: 49   Date Filed: 07/15/2003 Entry ID: 1665148

indictment. T. VIII at 8-9; <u>United States v. Frazier</u>, 280 F.3d 835, 848 (8th Cir. 2002) (cautionary instruction alleviated any prejudicial impact from Rule 404(b) evidence).

Crenshaw also objects that the District Court permitted the prosecutor to cross-examine Crenshaw's alibi witness -- his fiancé Twanda McCoy -- about this prior conviction as well as a separate felony conviction for reckless discharge of a firearm. While Crenshaw argues that McCoy had not been called as a character witness, that is not quite the case. In the course of trying to give Crenshaw an alibi for the time of the murder, McCoy also strove to portray Crenshaw as a gentle, caring person who did nothing more than take his family to Rondo Days on the day in question, left at the first sign of trouble, and was home giving his young son a bath at the time of the murder. T. 1338-42. Most of these embellishments were things McCoy never told homicide investigators when they questioned her about Crenshaw shortly after the murder. T. 1383.

Under all the circumstances, the District Court thought it appropriate to grant the government some leeway to explore McCoy's credibility and bias. T. 1348. The government's inquiry about Crenshaw's prior convictions was brief, consisting of about 10 questions, T. 1349-50, and was designed only to show that McCoy was so loyal to Crenshaw that she stayed with him through thick and thin. T. 1354-55; T. VII at 50. Once again, the prosecutor mentioned this

37

Appellate Case: 03-1067    Page: 50    Date Filed: 07/15/2003 Entry ID: 1665148

evidence in closing argument only as it related to McCoy's credibility and bias, T. VII at 50, and the District Court gave a proper limiting instruction. T. VIII at 8-9. There was no error in admitting the challenged evidence, certainly no error that affected the outcome.[8]

---

[8]The District Court's decision to give the government some latitude in cross-examination may also have influenced by Crenshaw's failure to comply with the government's Rule 12.1 demand for notice of alibi. In Crenshaw's pretrial response to that demand, he listed only one alibi witness, Twanda McCoy. During the trial, Crenshaw's trial counsel (Mr. Mahoney, not Mr. Ostgard) again assured the Court and the government that McCoy was his only alibi witness. See T. 1323. He then proceeded to call as his first witness a different alibi witness that had never been disclosed in violation of Rule 12.1. T. 1316. When it became clear during this witness's testimony that she was in fact an alibi witness, the government objected and the District Court directed defense counsel to curtail his examination of that witness. T. 1322-24.

Appellate Case: 03-1067    Page: 51    Date Filed: 07/15/2003 Entry ID: 1665148

**IV. THE DISTRICT COURT PROPERLY REFUSED TO ORDER DISCLOSURE OF THE IDENTITY OF A CONFIDENTIAL INFORMANT WHO WAS NOT A WITNESS TO THE CRIME**

Finally, McGruder argues that the District Court should have ordered disclosure of the identity of a confidential informant, even though the informant was not a witness to the crime. The District Court did not abuse its discretion in refusing to order disclosure. United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) (abuse of discretion standard of review applies).

The law is clear that the government has a qualified privilege to protect the identity of its informants. Roviaro v. United States, 353 U.S. 53, 59 (1957). The privilege may be overcome, but only where the informant is a material witness or the informant's testimony is critical to the defense. Carpenter v. Lock, 257 F.3d 775, 779 (8th Cir. 2001), cert. denied, 534 U.S. 1091 (2002). Disclosure of a mere tipster is not required. Id. The burden is on the defendant to demonstrate the need for disclosure. Id. The defendant must provide "more than speculation that the evidence an informant may provide will be material" in order to overcome the government's privilege. Id.

It is undisputed that the informant at issue was not present at the scene of the crime. He or she therefore was not a material witness subject to disclosure. At most, the informant was a mere tipster. The informant was present several days after the murder and overheard parts of a conversation between "Rico" Williams and several other people. T.

39

Jury Selec. (5/23/02) at 52-61. According to the informant, "Rico" Williams named certain people that were involved in shooting at the Bogus Boys, but allegedly did not name McGruder at that time. <u>Id.</u>

The government duly disclosed a report detailing the informant's account of this conversation to the defense in discovery. McGruder then requested disclosure of the informant's identity. <u>Id.</u> The District Court heard extensive argument at several different points during the trial. <u>Id.</u>, T. 5-6, 762, 1228-30, 1378-80. Ultimately, the Court ruled that disclosure of the informant's identity was not required. T. 1378-80.

The District Court's refusal to order disclosure was correct. The informant had no first-hand information about the murder. The informant's testimony at most would have only impeached "Rico" Williams with a possibly inconsistent prior statement; it would not have been admissible as substantive evidence. <u>Firemen's Fund Ins. v. Thien</u>, 8 F.3d 1307, 1311 (8th Cir. 1993). Disclosure also was not necessary because the conversation the informant overheard involved several other people, who were named in the report that was disclosed to the defense. T. Jury Selec. at 56. The defense could have called any of those other participants to try to establish that "Rico" Williams made a prior inconsistent statement on the day in question.

McGruder failed to meet his burden of showing that his need for disclosure outweighed the government's interest in protecting the

Appellate Case: 03-1067    Page: 53    Date Filed: 07/15/2003 Entry ID: 1665148

informant's identity.  This was, after all, a case involving a brutal gang-related murder.  The risk to the informant from public disclosure that he or she had been cooperating with law enforcement against the Rolling 60's gang since 1996 is obvious and undisputed.  T. Jury Selec. at 53, 57.  The interest in protecting the informant's life outweighed any marginal benefit to the defense from disclosure.

McGruder also contends the District Court erred by not conducting an in camera examination of the informant to determine if the informant possessed crucial information.  Such a hearing was not necessary because there was no dispute about the content of the informant's information, which was summarized in a police report that all defense counsel as well as the Court were able to review.  T. 1377, cf. United States v. Lapsley, 263 F.3d 839, 843 (8th Cir. 2001) (in camera hearing necessary because extent of informant's information unknown).  The only issue was whether the information was important enough to warrant risking the informant's life by publicly disclosing his or her identity, when there were alternative sources for the same information. The District Court correctly ruled that it was not.

41

**CONCLUSION**

For the foregoing reasons, the conviction of all three defendants should be affirmed.

**CERTIFICATE OF COMPLIANCE**

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 1357 lines of monospaced type. The brief was prepared using WordPerfect 9. The undersigned attorney also certifies that the computer diskette containing the full text of the Brief of Appellee has been scanned for viruses and to the best of our ability and technology, believes it is virus-free.

Dated: July 12, 2003       Respectfully submitted,

THOMAS B. HEFFELFINGER
United States Attorney


BY: JEFFREY S. PAULSEN
Assistant U.S. Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415
Attorneys for Appellee

42

Appellate Case: 03-1067    Page: 55    Date Filed: 07/15/2003 Entry ID: 1665148

**ADDENDUM OF APPELLEE**

Photographs of Kevin McGruder and of persons selected from
    photospread . . . . . . . . . . . . . . . . . . . .  A-1-2

Appellate Case: 03-1067   Page: 56   Date Filed: 07/15/2003 Entry ID: 1665148